UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

JAMES MICHAEL KENNY,

                Petitioner,              Case No. 2:20-cv-96

v.                                   Honorable Robert J. Jonker

KRIS TASKILA,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner James Michael Kenny is incarcerated with the Michigan Department of Corrections at the Baraga Correctional Facility (AMF) in Baraga, Baraga County, Michigan. On April 28, 2016, following a two-day jury trial in the Clinton County Circuit Court, Petitioner was convicted of aggravated stalking, in violation of Mich. Comp. Laws § 750.411i, assault with a dangerous weapon, in violation of Mich. Comp. Laws § 750.82, and obstructing a police officer, in violation of Mich. Comp. Laws § 750.81d. On May 26, 2016, the court sentenced Petitioner as a fourth habitual offender, Mich. Comp. Laws § 769.12, to concurrent prison terms of 12 to 35 years for aggravated stalking, 10 to 15 years for assault, and 10 to 15 years for obstructing a police officer.

        On June 25, 2020, Petitioner filed his habeas corpus petition raising four grounds for relief, as follows:

    I.      Denied due process/judicial misconduct. After the jury was excused at the close of Day 1 of the trial, the trial court had tipped off the Assistant Prosecuting Attorney (APA) to go secure the Ionia County Personal Protection Order (P.P.O.) file with Proof of Service since Aggravated Stalking is a criminal offense and "actual notice" is an element unlike civil injunction.

II.     Insufficient evidence. Michael Bartman testified that he heard a knock on his front door and proceeded to answer and upon opening door Petitioner had pulled out a table knife and Bartman lunged at him and knocked knife out of Petitioner's hands before he could use it.  However, a photograph of knife shows it in the middle of his driveway contrary to his front porch.

III.    Due Process/Fair Trial/Insufficient Evidence.  Trial court failed to instruct jury of the lawfulness of the Sheriff Deputy's actions thereby relieving prosecution of burden of proof as to element of Resisting and Obstructing a Police Officer.  Furthermore, Deputy's testimony falls short to prove that Petitioner even knew he was there much less disobey his command.

IV.     Brady Violation.  Petitioner was denied DNA & fingerprint results of table knife in question and of a cap.  A week before trial APA provides a 2-page report from MSP lab that fingerprints are in[con]clusive.  Deputy Eric Thompson testified that he decided not to send in DNA swabs of knife and cap reasoning [it was] unnecessary because he has a picture of Petitioner wearing cap.

(Pet., ECF No. 1, PageID.6–10.)  Respondent has filed an answer to the petition (ECF No. 8) stating that the grounds should be denied because they are meritless, non-cognizable, or procedurally defaulted.  Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), I find that the grounds are meritless.  Accordingly, I recommend that the petition be denied.

<u>Discussion</u>

I.    **Factual allegations**

The Michigan Court of Appeals described the facts underlying Petitioner's convictions as follows:

This case arose out of defendant's obsession with Michelle Monroe, a corrections officer who worked at a prison where defendant was once incarcerated. Monroe testified that defendant "at times taunted" her and made inappropriate comments during his incarceration.  He also sent a letter to a prison inspector in which he claimed that he and Monroe had engaged in sexual conduct.  Monroe testified that this was false and that the prison had investigated this accusation and found it unsubstantiated.  Defendant was transferred to a different prison because of his conduct towards Monroe.  Once defendant was released from prison, he tried to contact Monroe by sending her letters and calling the prison where she worked.

2

Monroe obtained a personal protection order (PPO) against defendant after defendant sent a letter about Monroe to her father.

A few months after the PPO was issued, defendant appeared at Monroe's home. Monroe's fiancé, Michael Bartman, testified that he answered a knock on the door while Monroe was at work. Although Bartman did not immediately recognize defendant, he quickly realized that was the man who "was pretty much stalking" Monroe based on photos Monroe had shown him. Bartman testified, "I was going to grab him and I guess do a citizen's arrest . . . [b]ecause [defendant] had a PPO on him and he's on my doorstep." Bartman lunged at defendant, and defendant "pulled back [and] pulled a knife out." Bartman described the knife as a "standard dinner knife," but at the time he "wasn't worried what kind of knife it was" because he thought he was "going to die." Bartman knocked the knife out of defendant's hands and then "started swinging at him, and he was swinging back." Bartman chased defendant down the driveway but when he could not keep up with him, he went back into the house and called 911.

A number of officers responded to the scene and Bartman testified that there "was a manhunt" to find defendant for approximately 30 to 45 minutes. Sergeant Chris Crawford of the Clinton County Sheriff's Department testified that while he was searching, he saw defendant approximately 20 to 30 yards away in a "wooded area along a creek." He identified himself as a police officer and told defendant to stop, but defendant "took off running." Portland police officer Star Thomas eventually arrested defendant, and Deputy Zachary Smith of the Clinton County Sheriff's Office brought defendant back to Bartman and Monroe's house so they could identify him. Monroe and Bartman both testified that when they saw defendant, he vowed to kill them.

(Mich. Ct. App. Op., ECF No. 9-9, PageID.631–632.) "The facts as recited by the Michigan Court of Appeals are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1)." *Shimel v. Warren*, 838 F.3d 685, 688 (6th Cir. 2016) (footnote omitted).

Petitioner directly appealed his convictions and sentences to the Michigan Court of appeals. It appears that he represented himself throughout his direct appeal. He raised each of the issues he presents in this petition. By opinion issued April 16, 2019, the court of appeals denied relief, addressing each of Petitioner's appeal issues on the merits. Thereafter, Petitioner filed an application for leave to appeal to the Michigan Supreme Court raising the same issues he raised in the court of appeals. The supreme court denied leave by order entered October 29, 2019. (Mich. Order, ECF No. 9-10, PageID.773.)

3

## II.    AEDPA standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693–94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision."  *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)) (internal quotation marks omitted)).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002).  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough*, 541 U.S. at 664. "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review.  The federal court is not free to consider any possible factual source.  The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011).  "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits.  *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"— for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721.  Then, the petitioner's claim is reviewed *de novo*.  *Id.* (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## III.    Judicial misconduct

There are several circumstances that convert "stalking" to "aggravated stalking." One such circumstance occurs when the "actions constituting the offense [violates] a restraining order and the individual has received actual notice of that restraining order[.]"  Mich. Comp. Laws § 750.411i(2)(a).  Petitioner claims that at the end of the first day of trial the judge gave the prosecutor a "heads up" regarding the need to show actual notice.

The record bears out Petitioner's claim.  After the jury left the courtroom at the end of the first day of trial, the trial judge reviewed with counsel several issues, including the need to prove actual notice:

> With regard to Judge Hoort's order in the Ionia County file, I'm assuming probably that somebody has the Ionia County file to show actual notice on the part of the Defendant of the fact that the restraining order was issued, because strangely

6

enough even though the personal protection order law says you don't have to have actual notice to be bound, the statute dealing with stalking as a criminal offense says if it's a restraining order instead of an injunction, you do have to have notice, actual notice.  So whether or not somebody's going to bring the file over, whether or not it contains a proof of service, other things, that's, you know, not my case to try but I'm assuming somebody can check with Ionia if they want regarding the status of that file.

(Trial Tr. I, ECF No. 9-3, PageID.427–428.)

Petitioner contends that Judge Tahvonen's comment violated his due process rights. Petitioner does not clearly explain how.  He compares his situation to the situation in *Webb v. Texas*, 409 U.S. 95 (1972), where the judge made threatening remarks to the defendant's sole witness.  The *Webb* Court concluded that the judge's conduct violated the defendant's due process rights because he "effectively drove that witness[, the single witness for the defense,] off the stand . . . ." *Id*. at 98.  The Court determined that the judge interfered with the defendant's right to present his own witnesses and, by that interference, violated the defendant's due process rights. *Id*.  But Judge Tahvonen did not threaten a witness here.

Petitioner next compares his situation to that of the defendant in *People v. Prescott*, 256 N.W. 564 (Mich. 1934).  In *Prescott*, the defendant was accused of statutory rape of a fifteen-year-old girl.  The prosecutor elicited testimony from the mother regarding the girl's date of birth. In closing, defense counsel invited the jurors to "look at the girl . . . do you believe she was under the age of sixteen years old?"  *Id*. at 565.  He also noted that there are birth records in Detroit, where the victim was born an asked the jury why did the prosecutor not produce them?  *Id*.  The prosecutor objected, but the court overruled the objection.  The judge went on to note that he did not care what the verdict was, before he would pass sentence, he would obtain a birth certificate. Then, in the prosecutor's rebuttal, he argued "Now, if there is a record over there showing that the girl's age is sixteen, don't you think defense counsel has investigated to see and would have . . . ."

7

*Id*.  At that point, the defense objected contending that the prosecutor was shifting the burden of

proof.

   The Michigan Supreme Court reversed the conviction and granted a new trial for

the following reason:

> The remarks by the trial judge relative to the certificate of birth constituted reversible error, for it operated as an assurance to the jury that the court would take evidence upon the question of age after verdict, if defendant was convicted, and tended strongly to relieve the jurors of their otherwise essential sense of ultimate responsibility.  The jurors might well have felt that, in case they found defendant guilty, the trial judge would subsequently save error, if any, on their part by examination of the record of the birth of the girl.  Sense of conscientious responsibility on the part of jurors must not be lessened by any such assurance by the court.

*Id*.  The state supreme court's holding is certainly not clearly established federal law.  But, even if

it was, nothing comparable occurred in Petitioner's trial.  Judge Tahvonen did not suggest that he

would correct any error before sentencing if the jury got it wrong regarding Petitioner's actual

notice of the personal protection order.

   Petitioner's citations to *Quercia v. United States*, 289 U.S. 466 (1933), *United

States v. Murdock*, 290 U.S. 389 (1933), *overruled in part, Murphy v. Waterfront Comm'n of

N.Y.Harbor*, 378 U.S. 52 (1964), *Powell v. Galaza*, 282 F.3d 1089 (9th Cir. 2002),[1] *Blunt v. United

States*, 244 F.2d 355 (D.C. Cir. 1957), and *People v. Towns*, 125 N.E.3d 816 (N.Y. 2019), are

likewise inapposite.[2]  In *Quercia*, the Court explained that judicial comment to the jury regarding

the evidence  must not mislead or be one-sided.  In *Murdock*, the trial judge advised the jurors that,

although the jurors could disregard his opinion, the trial judge believed the government had

---

[1] *Powell* was vacated by the Supreme Court in *Galaza v. Powell*, 537 U.S. 1016 (2002), and remanded for reconsideration in light of recent authority.  On reconsideration, however, the court of appeals reached the same result. *Powell v. Galaza*, 328 F.3d 558 (9th Cir. 2003).  Thus, for purposes of this analysis, the ultimate result and, for the most part, the reasoning remained the same.

[2] Petitioner also cites *State v. Hedrick*, No. 35536, 2011 W.V. Lexis 243 (W.V. June 21, 2011), a misdemeanor case about a golden trout, a rainbow trout, and two other fish.  It is a mystery why Petitioner relies upon *Hedrick*.

sustained its burden in the case.  In *Powell*, the trial court effectively removed an issue from the jury's consideration by way of instructions.  In *Blunt,* the trial judge made improper comments about the evidence to the jurors ***and*** effectively took an issue away from the jury by way of the instructions. In *Towns*, the trial judge negotiated with a co-defendant to secure his testimony against the defendant.  But in Petitioner's case, the allegedly objectionable comments were made outside the presence of the jury, the "actual notice" instructions left the matter entirely in the jurors' hands, and the trial judge did not negotiate a plea or secure testimony on the prosecution's behalf.

The Michigan Court of Appeals also struggled to analyze Petitioner's arguments on this issue.  The court stated:

> [T]here is no risk that the trial court's comment improperly influenced the jury by creating the appearance of advocacy or partiality against a party.  See *Stevens*, 498 Mich at 164.  Nor did the trial court overstep its authority and assume the role of an advocate.  A trial court may exercise reasonable control over the presentation of the evidence to "make the . . . presentation effective for the ascertainment of the truth . . . ."  MRE 611(a).  Monroe testified that defendant received notice of the PPO because she "had him served."  It is unclear whether Monroe's testimony, in the absence of a sustained objection, would have sufficed to prove actual notice.  In any event, the trial court shared with the parties its view of what evidence was required to make that showing.  We decline to hold that the trial court committed misconduct by stating the evidence necessary to prove aggravated stalking.

(Mich. Ct. App. Op., ECF No. 9-9, PageID.633.)  Petitioner does not explain how the court of appeals determination is contrary to clearly established federal law.  For the reasons stated above, the court's decision is clearly not contrary to the authorities Petitioner has cited.

Stepping back from Petitioner's presentation of the issue in his memorandum, it is certainly true that "[d]ue process requires a fair trial before a judge without actual bias against the defendant or an interest in the outcome of his particular case."  *United States v. Armstrong*, 517 U.S. 456, 468 (1996); *see also In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process.  Fairness requires an absence of *actual* bias in the

trial of cases.") (emphasis added)).  However, because of the difficulty in determining "whether a judge harbors an actual, subjective bias," the courts look to "whether, as an objective matter, the average judge in [that judge's] position is likely to be neutral, or whether there is an unconstitutional potential for bias."  *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016) (internal quotations omitted); *see also Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 883 (2009).

The Supreme Court has recognized constitutionally impermissible, objective indicia of bias in the following types of cases:  (1) those cases in which the judge "has a direct, personal, substantial pecuniary interest in reaching a [particular] conclusion," *Tumey v. Ohio*, 273 U.S. 510, 523 (1997) (subsequently expanded to include even indirect pecuniary interest, *see Railey v. Webb*, 540 F.3d 393, 399–400 (6th Cir. 2008); (2) certain contempt cases, such as those in which the "judge becomes personally embroiled with the contemnor," *Murchison*, 349 U.S. at 141 (subsequently clarified to involve cases in which the judge suffers a severe personal insult or attack from the contemnor); and (3) cases in which a judge had prior involvement in the case as a prosecutor, *Williams*, 136 S. Ct. at 1905 (citing *Withrow v. Larkin*, 421 U.S. 35, 53 (1975)).  The courts indulge "a presumption of honesty and integrity in those serving as adjudicators."  *Withrow*, 421 U.S. at 47; *Coley v. Bagley*, 706 F.3d 741, 751 (6th Cir. 2013) (citing, *inter alia*, *Withrow*, 421 U.S. at 47).  "The presumption of impartiality stems not merely from the judicial-bias caselaw, but from the more generally applicable presumption that judges know the law and apply it in making their decisions, *see Lambrix v. Singletary*, 520 U.S. 518, 532 n.4 (1997), and the even more generally applicable presumption of regularity, *see Parke v. Raley*, 506 U.S. 20, 30–31." *Coley*, 706 F.3d at 751.

In *Liteky v. United States*, 510 U.S. 540 (1994),[3] the Supreme Court described the

showing Petitioner would have to make to succeed on his bias claim:

> First, judicial rulings alone almost never constitute a valid basis for a bias
> or partiality motion. *See United States v. Grinnell Corp.*, 384 U.S. at 583.  In and
> of themselves (i.e., apart from surrounding comments or accompanying opinion),
> they cannot possibly show reliance upon an extrajudicial source; and can only in
> the rarest circumstances evidence the degree of favoritism or antagonism required
> (as discussed below) when no extrajudicial source is involved.  Almost invariably,
> they are proper grounds for appeal, not for recusal.  Second, opinions formed by
> the judge on the basis of facts introduced or events occurring in the course of the
> current proceedings, or of prior proceedings, do not constitute a basis for a bias or
> partiality motion unless they display a deep-seated favoritism or antagonism that
> would make fair judgment impossible.  Thus, judicial remarks during the course of
> a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or
> their cases, ordinarily do not support a bias or partiality challenge.  They may do
> so if they reveal an opinion that derives from an extrajudicial source; and they will
> do so if they reveal such a high degree of favoritism or antagonism as to make fair
> judgment impossible.  An example of the latter (and perhaps of the former as well)
> is the statement that was alleged to have been made by the District Judge in *Berger
> v. United States*, 255 U.S. 22 (1921), a World War I espionage case against
> German-American defendants:  "One must have a very judicial mind, indeed, not
> [to be] prejudiced against the German Americans" because their "hearts are reeking
> with disloyalty."  *Id.*, at 28 (internal quotation marks omitted).  Not establishing
> bias or partiality, however, are expressions of impatience, dissatisfaction,
> annoyance, and even anger, that are within the bounds of what imperfect men and
> women, even after having been confirmed as federal judges, sometimes display.  A
> judge's ordinary efforts at courtroom administration—even a stern and
> short-tempered judge's ordinary efforts at courtroom administration—remain
> immune.

*Liteky*, 510 U.S. at 555–56.

Here, Petitioner offers nothing more to show bias than Judge Tahvonen's comment

that actual notice was an element of the aggravated stalking claim and that such notice could be

shown through the court file created for the restraining order.  It is not as if the prosecutor was not

aware of the requirement to prove actual notice.  He specifically referenced that requirement in his

---

[3] *Liteky* is a case that addresses the statutory recusal standard for federal judges.  The Sixth Circuit has, nonetheless, relied on *Liteky* to provide the standard for assessing judicial bias claims under the Due Process Clause.  *See Alley v. Bell*, 307 F.3d 380, 386 (6th Cir. 2002); *Lyell v. Renico*, 470 F.3d 1177, 1187 (6th Cir. 2006).

opening argument.  (Trial Tr. I, ECF No. 9-3, PageID.292.)  And he informed the jury that the victims and a deputy would testify regarding the fact that Petitioner had actual notice of the restraining order.  It is not clear how Judge Tahvonen's statements regarding the proof requirements for the claim—outside the presence of the jury—provide objective evidence of bias.

The court of appeals' conclusion that Petitioner failed to demonstrate judicial bias is not contrary to, or an unreasonable application of, clearly established federal law.  The court of appeals' factual determinations regarding the issue are reasonable on the record.  Petitioner is simply not entitled to habeas relief on his judicial bias claim.

## IV.    Sufficiency

Petitioner next argues that there was insufficient evidence to permit a finding of guilt beyond a reasonable doubt on the charges.  In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Supreme Court announced the following standard for resolving sufficiency claims:  the court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id*. at 319.  The *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Id*.  Witness credibility remains the province of the jury, *see Herrera v. Collins*, 506 U.S. 390, 401–02 (1993), and an attack on witness credibility constitutes a challenge to the quality, but not the sufficiency of the government's evidence.  *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002).  The habeas court need only examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law.  *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196–97 (6th Cir. 1988).

Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case:  First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008).  This standard erects "'a nearly insurmountable hurdle'" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds.  *Davis*, 658 F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

In resolving Petitioner's sufficiency claims, the court of appeals applied the following standard:  "We view the evidence 'in the light most favorable to the prosecution, to determine whether the trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt.'"  (Mich. Ct. App. Op., ECF No. 9-9, PageID.634.)  The statement of the standard is based on state authority; but the standard is functionally identical to the *Jackson* standard.  Indeed, if one looks to the state authority cited, and then the state authority cited in that case, and so on, the state authority is ultimately founded on *Jackson*. *People v. Wolfe*, 489 N.W.2d 748, 750–51 (Mich. 1992).  Thus, the Michigan Court of Appeals obviously applied the correct standard to resolve Petitioner's sufficiency claim, leaving only the question whether the court applied the standard reasonably.

The court of appeals applied the standard exactly as *Jackson* directs.  It identified the elements of the charged crimes as established by state law and then considered the evidence introduced at trial to determine whether, viewed in a light most favorable to the prosecution, that evidence would support a determination of guilt beyond a reasonable doubt.

The court of appeals described the elements of aggravated stalking as follows:

13

Aggravated stalking consists of the crime of stalking coupled with an aggravated circumstance specified in MCL 750.411i(2).  *People v Threatt*, 254 Mich App 504, 505; 657 NW2d 819 (2002).  Stalking is

> a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested.  [MCL 750.411i(1)(e).]

Stalking becomes aggravated stalking when, among other possible scenarios, "the actions constituting the [stalking] offense are in violation of a restraining order and the individual has received actual notice of that restraining order . . . ."  MCL 750.411i(2)(a).

(Mich. Ct. App. Op., ECF No. 9-9, PageID.634.)   Petitioner contended on appeal that the prosecutor failed to present sufficient evidence of actual notice.  He does not specifically repeat that contention in his habeas petition.  Nonetheless, Petitioner's general reference to insufficiency of the evidence may be intended to cover the aggravated stalking count as well.

The court of appeals noted that the prosecutor presented evidence that Petitioner received actual notice of the restraining order—the proof of service described above.  (*Id*.) Petitioner's claim, therefore, is plainly meritless.  Petitioner also suggests he could not be criminally responsible for aggravated stalking because he did not know the victim's address.  The court of appeals rejected that claim because knowing the victim's address was not required to show "actual notice."  (*Id*.)  The court of appeals further explained that the prosecution demonstrated through circumstantial evidence that defendant knew where the victim lived and arrived there willfully:

> The evidence established that defendant had an unhealthy obsession with Monroe which led her to obtain a PPO.  Defendant subsequently arrived at her home and knocked on the door.  When the police arrested defendant, he was carrying a black, serrated folding pocketknife and a disposable camera.  The film was developed and contained photographs depicting Monroe's property.  It is irrelevant that the PPO did not contain Monroe's address because the prosecution was not required to prove how defendant learned where she lived.  Instead, it was only required to prove beyond a reasonable doubt that defendant acted willfully.

14

(*Id*., PageID.634–635.)  The court concluded that viewing the evidence in the appropriate light, the prosecution satisfied its burden.

The court of appeals then reviewed the elements for assault with a dangerous weapon: "(1) and assault, (2) with a dangerous weapon, and (3) with the intent to injure or place the victim in reasonable apprehension of an immediate battery."  (*Id*., PageID.635.)  The court described the evidence as follows:

> The jury had an opportunity to examine the knife because it was admitted into evidence.  Although a "dinner" or "table" knife (as it was variously referred to at trial) is not designed to be dangerous, it can become a dangerous weapon if used for the purpose of an assault.  Here, Bartman testified that defendant drew the knife in response to Bartman's advance and thus a reasonable jury could conclude that defendant intended to use the knife as a dangerous weapon.

(*Id*.)  Petitioner does not challenge the court of appeals' description of the elements or the evidence.  Instead, he invites this Court to reach different conclusions because the evidence could also be interpreted in a way that Bartman's testimony was not credible.  Essentially, Petitioner is asking the Court to do that which *Jackson* says it cannot:  make credibility determinations that are different than those the jury made and view the evidence in a light that favors Petitioner.

Finally, the court of appeals reviewed the elements of resisting a police officer: "(1) the defendant . . . obstructed . . . a police officer, and (2) the defendant knew or had reason to know that the person that the defendant . . .  obstructed . . . was a police officer performing his or her duties."  (*Id*., PageID.636.)  The court then reviewed the evidence relating to those elements in a light that favored the prosecution:

> Sergeant Crawford testified that he was searching for the suspect when he saw defendant 20 to 30 yards away in a "wooded area along a creek"; defendant matched the suspect's description.  Crawford identified himself as a police officer and ordered defendant to stop.  Crawford said that defendant "took off running," but later clarified that defendant was already running when the command was made.  Crawford and the other officers did not have a bullhorn or any other way to amplify their voice, but Crawford testified that he yelled his command for defendant to stop.  When defense counsel asked whether defendant did anything to indicate that he

heard the officers tell him to stop, Crawford responded that he "[c]ontinued to run after he knew we were there."

This testimony was sufficient to allow a rational trier of fact to conclude that the elements of resisting or obstructing arrest were met. Defendant knew or had reason to know that Sergeant Crawford was a police officer because he identified himself as such. According to Crawford, defendant continued to run after he knew the police were there, thereby obstructing the police by failing to comply with a lawful command. Defendant claims that he did not obstruct Crawford because he did not hear his order to stop. However, Crawford testified that he heard defendant making noise as he walked through the brush from approximately 40 to 60 feet away. And if Crawford could hear defendant walking through the brush, then a reasonable jury could infer that defendant would have been able to hear[] Crawford's command. Further, Crawford testified that defendant was not continuously running and at one point was "hunkered down," which indicates that defendant only began to run once he became aware of the officer's presence. Finally, "seizures are reasonable for purposes of the Fourth Amendment . . . if based on probable cause." *People v Lewis*, 251 Mich App 58, 69; 649 NW2d 792 (2002). When Sergeant Crawford saw defendant, he knew defendant was accused of violating a PPO, stalking, and assault. Accordingly, he had probable cause to order defendant to stop and to arrest him.

(*Id.*)

Petitioner challenges the court of appeals' determination because "the police officer came [from] 90 feet away from [Petitioner who] was already running and [the officer] does not know whether or not Petitioner ever heard him because Petitioner never acknowledged him one way or another by gesture or word." (Pet'r's Reply Br., ECF No. 10, PageID.820.) Petitioner's view of the evidence in his favor, however, is not the appropriate measure of sufficiency under *Jackson*. Petitioner does not claim that the evidence described by the court of appeals was inaccurate or that the inferences identified by the court—i.e., that if the officer heard Petitioner moving through the brush, then it is probable that Petitioner was able to hear the officer as well—were unreasonable. Instead, Petitioner invites this Court to turn the *Jackson* standard on its head by viewing the evidence in a light that favors him and then invading the province of the jury by drawing different inferences and making different credibility determinations.

*Jackson* holds that it is the jury's province to draw reasonable inferences from basic facts to ultimate facts. 443 U.S. at 319.  In *Coleman v. Johnson*, 566 U.S. 650 (2012), the Supreme Court provided guidance "in determining what distinguishes a reasoned inference from 'mere speculation.'" *Id*. at 655.  The Court described a reasonable inference as an inference that a rational jury could make from the facts.  Certainly, the inferences identified by the court of appeals rationally flow from the underlying facts.  The inferences are not compelled by those facts.  The inferences may not even be more likely than not; they are simply rational.  *Id*. at 656.  To succeed in his challenge, Petitioner must show that the identified inferences are irrational.  He has not.  His argument depends on ignoring the reasonable inferences identified by the court of appeals and adopting other inferences that favor Petitioner.

The court of appeals' rejection of Petitioner's sufficiency claims with regard to each element of the charges was neither contrary to, nor an unreasonable application of, clearly established federal law.  Moreover, the factual determinations regarding the evidence upon which the rejection relied are well-supported by the record.  Accordingly, Petitioner is not entitled to habeas relief on his sufficiency claims.

## V.   **Improper instructions**

Petitioner next challenges the jury instructions given with respect to the charge of obstructing a police officer.  A claim that a trial court gave an improper jury instruction is not cognizable on habeas review.  Instead, Petitioner must show that the erroneous instruction so infected the entire trial that the resulting conviction violates due process. *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *see also Estelle v. McGuire*, 502 U.S. 62, 75 (1991) (erroneous jury instructions may not serve as the basis for habeas relief unless they have so infused the trial with unfairness as to deny due process of law); *Rashad v. Lafler*, 675 F.3d 564, 569 (6th Cir. 2012)

(same); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000) (same).  The requirement of

prejudice is part of the standard:

> [T]he degree of prejudice . . . required . . . before obtaining collateral relief
> for errors in the jury charge [is] whether the ailing instruction so infected the entire
> trial that the resulting conviction violates due process, not merely whether the
> instruction is undesirable, erroneous, or even universally condemned. . . .  [T]he
> degree of prejudice resulting from instruction error be evaluated in the total context
> of the events at trial.  As we have often emphasized:  [A] single instruction to a jury
> may not be judged in artificial isolation, but must be viewed in the context of the
> overall charge.  Moreover, "a judgment of conviction is commonly the culmination
> of a trial which includes testimony of witnesses, argument of counsel, receipt of
> exhibits in evidence, and instruction of the jury by the judge.  Thus not only is the
> challenged instruction but one of many such instructions, but the process of
> instruction itself is but one of several components of the trial which may result in
> the judgment of conviction.

*United States v. Frady*, 456 U.S. 152, 169 (1982) (citations and internal quotes omitted).  If

Petitioner fails to meet this burden with regard to the error and the resulting prejudice, he fails to

show that the jury instructions were contrary to federal law.

The Model Criminal Jury Instruction for the offense of obstructing a police officer

reads as follows:

> (1) The defendant is charged with the crime of assaulting, battering, wounding,
> resisting, obstructing, opposing, or endangering a [police officer / (*state authorized
> person*)] who was performing [his / her] duties.  To prove this charge, the
> prosecutor must prove each of the following elements beyond a reasonable doubt:

> (2) First, that the defendant assaulted, battered, wounded, resisted, obstructed,
> opposed, or endangered1 [*name complainant*], who was a [police officer / (*state
> authorized person*)].  ["Obstruct" includes the use or threatened use of physical
> interference or force or a knowing failure to comply with a lawful command.][3] [The
> defendant must have actually resisted by what (he / she) said or did, but physical
> violence is not necessary.][3]

> (3)    Second, that the defendant knew or had reason to know that [*name
> complainant*] was a [police officer / (*state authorized person*)] performing [his /
> her] duties at the time.

> (4)   Third, that [*name complainant*] gave the defendant a lawful command, was
> making a lawful arrest, or was otherwise performing a lawful act.[4]

\*     \*     \*

[3] The court may include this sentence where necessary.

[4] The court should provide detailed legal instructions regarding the applicable law governing the officer's legal authority to act.

Mich. Model Crim. Jury Instructions 13.1 (footnotes 1 and 2 omitted).  Petitioner complains that the trial court did not read the requirement that the prosecutor prove, beyond a reasonable doubt, that the officer gave Petitioner a lawful command, was making a lawful arrest, or was performing a lawful act.

Petitioner's complaint finds some support in the record.  The trial court did not read that portion of the instruction under subpart (4).  (Trial Tr. II, ECF No. 9-4, PageID.498.)  But the court did read the following optional sentence:  "obstruct includes a knowing failure to comply with a lawful command."  (*Id.*)  By adding that optional sentence, the court rendered the instruction under subpart (4) duplicative and unnecessary.  The court specifically included the requirement of a lawful command in the instructions given.

The court of appeals also overlooked the significance of the trial court's reading of the optional sentence.  (Mich. Ct. App. Op., ECF No. 9-9, PageID.637) ("In this case, the trial court failed to instruct the jury that the officer's actions must have been lawful.").  The appellate court's factual determination is not reasonable based on the trial record, and the Court need not, and does not, accept it as true.

Although the court of appeals agreed with Petitioner that the instructions omitted an element, the court went on to conclude that Petitioner had suffered no prejudice:

In this case, the trial court failed to instruct the jury that the officer's actions must have been lawful.  However, defendant fails to explain how he was prejudiced by this error.  As discussed above, the officers had probable cause to arrest defendant, and defendant does not argue otherwise.  Thus, while defendant is correct that the trial court should have instructed the jury on all elements of the offense, he has not shown that this error affected the outcome at trial.

(Mich. Ct. App. Order, ECF No. 9-9, PageID.637.)  That determination is well-grounded in the record and entirely consistent with clearly established federal law.  In the context of the instructions as a whole, and the trial as a whole, because the trial court specifically informed the jurors that the officer's command must be lawful and because the lawfulness of the officer's command was never called into question, there is no prejudice here.  Accordingly, Petitioner has failed to demonstrate a due process violation arising from the instructions and he is not entitled to habeas relief on this claim.

## VI.    *Brady* **violation**

Petitioner next complains that the prosecutor suppressed favorable evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  Under *Brady*, "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady*, 373 U.S. at 87.  The Supreme Court has held that "[t]here are three components of a true *Brady* violation:  [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).  Prejudice (and materiality) is established by showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Id.* at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)); *see also Cone v. Bell*, 556 U.S. 449, 469–70 (2009).  A reasonable probability is "'a probability sufficient to undermine confidence in the outcome.'"  *Bagley*, 473 U.S. at 682 (quoting *Strickland*, 466 U.S. at 694.).

The Michigan Court of Appeals rejected Petitioner's *Brady* claim:

A defendant does not have a constitutional right to discovery, but "due process requires the prosecution to disclose evidence in its possession that is exculpatory and material, regardless of whether the defendant requests the evidence." *People v Jackson*, 292 Mich App 583, 590; 808 NW2d 541 (2011).  In *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  To establish a *Brady* violation, a defendant must show that "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material."  *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014).

On April 22, 2016, defendant filed a motion to dismiss the felonious assault charge because of an alleged discovery violation.  In his motion, defendant asserted that the prosecution had recently found and provided the fingerprint analysis of the knife found in Monroe's driveway, but had informed defendant that the results of DNA testing would not be completed by trial.  Before the trial began on April 27, 2016, the trial court stated that it would reserve ruling on defendant's motion and instructed both parties not to reference DNA testing in their opening statements. The prosecution and defendant stipulated to the admission of the fingerprint report, which was inconclusive.

At trial, Deputy Eric Thompson of the Clinton County Sheriff's Office testified that he did not submit for testing DNA swabs taken of the knife and a hat found in Monroe's driveway.   Thompson explained that DNA testing was unnecessary because Bartman saw defendant with the knife and a photograph recovered from defendant's camera showed defendant wearing the hat.  After the first day of trial, the trial court denied defendant's motion, reasoning that the DNA evidence was irrelevant.

Defendant's alleged *Brady* violation fails all three prongs.  The prosecution was not suppressing evidence.  Rather, the DNA tests results simply did not exist. And the prosecution was not required "to seek and find exculpatory evidence or assist in building or supporting a defendant's case . . . ."  *People v Bosca*, 310 Mich App 1, 30; 871 NW2d 307 (2015) (quotation marks and citation omitted).  Next, defendant cannot establish that the DNA testing would have been favorable to his defense. The photograph of him wearing the hat suggests that the DNA swab would have matched defendant's sample.  And even if the DNA swab of the knife would have been inconclusive, this evidence would not have been material given that Bartman identified defendant as the perpetrator of the assault and defendant was found in the surrounding area shortly after the incident.  Indeed, the inconclusive fingerprint analysis did not affect the outcome at trial.

(Mich. Ct. App. Op., ECF No. 9-9, PageID.638) (footnote omitted).  Petitioner's response to the court of appeals' analysis reads as follows:

> Petitioner has an independent due process right to [have] the DNA and fingerprint results of that table knife presented to the jury.  Who is to say Bartman's DNA and fingerprints are not on the knife in light of his obvious inconsistent statements?

(Pet'r's Reply Br., ECF No. 10, PageID.820.)

The court of appeals' determination that the DNA test results did not exist is presumed to be correct.  Petitioner does not offer any evidence, much less clear and convincing evidence, to the contrary.  Test results that do not exist cannot be favorable to the accused, cannot be "suppressed," and there can be no prejudice for failing to provide them.  The appellate court's determination that Petitioner's *Brady* claim fails on all three requirements of such a claim is inescapable.  And despite Petitioner's unsupported claim that he has a due process right to have such evidence presented to the jury, he does not.  Neither the police nor the prosecutor "have a constitutional duty to perform any particular tests."  *Arizona v. Youngblood*, 488 U.S. 51, 59 (1988).

Petitioner has failed to demonstrate that the state court's rejection of his *Brady* claim is contrary to, or an unreasonable application of, clearly established federal law.  Accordingly, he is not entitled to habeas relief on the claim.

## Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is

warranted.  *Id.*  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.  Consequently, I have examined each of Petitioner's claims under the *Slack* standard.  Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists of reason could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

I find that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims would be debatable or wrong.  Therefore, I recommend that the Court deny Petitioner a certificate of appealability.

Moreover, although I conclude that Petitioner has failed to demonstrate that he is in custody in violation of the constitution and has failed to make a substantial showing of a denial of a constitutional right, I would not conclude that any issue Petitioner might raise on appeal would be frivolous.  *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## **Recommended Disposition**

For the foregoing reasons, I recommend that the habeas corpus petition be denied. I further recommend that a certificate of appealability be denied.  Finally, I recommend that the Court not certify that an appeal would not be taken in good faith.

Dated:    April 2, 2021                                   /s/ *Maarten Vermaat*
                                                                      Maarten Vermaat

23

United States Magistrate Judge

## <u>NOTICE TO PARTIES</u>

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).